Frank H. Hoy and Myrtle W. Hoy v. Commissioner.
Hoy v. Commissioner
Docket Nos. 58990, 64204.
United States Tax Court
T.C. Memo 1958-28; 1958 Tax Ct. Memo LEXIS 202; 17 T.C.M. (CCH) 115; T.C.M. (RIA) 58028; February 25, 1958
*202 John S. Best, Esq., 110 East Wisconsin Avenue, Milwaukee, Wis., and Richard D. Hobbet, Esq., for the petitioners. John L. Pedrick, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax for the years 1950, 1951, 1952 and 1953, in the respective amounts of $33,949.60, $234.07, $1,225.71 and $946.45. The issues concern the valuation of a contract distributed to Frank H. Hoy on liquidation of a corporation in 1950 and the tax treatment of amounts received in the taxable years pursuant to that contract. The petitioners filed joint returns for the calendar years 1950 through 1953 with the collector or director of internal revenue at Milwaukee, Wisconsin. Findings of Fact The stipulated facts are incorporated herein by this reference. Petitioner Frank H. Hoy has been connected with the meat industry since 1915. In 1929 he acquired a meat processing business which he operated as Hoy Food Products Company. Hoy designed an improved metal mold for use in compression of meats for cooking in preparation of luncheon meats. He secured a design patent on such a mold. In 1937 Hoy organized *203 Hoy Equipment Company, a Wisconsin corporation, hereinafter referred to as the Company, to engage in the business of manufacturing, selling and dealing in equipment and supplies useful in connection with the meat packing and sausage industries. Hoy at all times held the controlling stock, and was president of the Company. He transferred to the Company all rights to 2 of his inventions for which applications for patents had been made in July 1937. Hoy later made other inventions which were transferred to the Company. On January 12, 1950, the Company owned 4 United States letters patent, 5 United States design patents, 3 pending applications for United States patents, 1 Canadian patent and 1 application for a Canadian patent. As of January 10, 1950, the capital stock of the Company was owned 121 shares by Hoy, 30 shares by Myrtle W. Hoy, 88 shares by the Marine National Exchange Bank of Milwaukee, Trustee under certain trusts created by Hoy for the benefit of members of his family, 30 shares by H. D. De Cressy, and 31 shares by other individuals. Until January 1950 the Company was in the business of selling a line of meat and ham molds. The Company did not manufacture molds but had *204 them made under contract by other concerns. The Company owned some of the equipment used in manufacture, such as jigs, dies and fixtures. Hoy and De Cressy were the salesmen. Customers of the Company included most parts of the meat packing industry from big companies to small concerns. At the end of 1949 there were some 400 to 500 customers out of a potential of 4,000 meat processors in the United States. A customer might use from 50 to 20,000 molds. The Company was one of the leading concerns among those selling ham and meat molds. Hoy was widely known in the meat industry and the trademark "Hoy" was of considerable value. In 1949 there was substantial possibility of further growth in the Company's business. The net sales of the Company for the years 1944 to 1949 and for January 1 to 12, 1950, were: 1944
$ 38,650.87
1945
96,576.20
1946
235,294.48
1947
547,435.21
1948
565,309.39
1949
412,444.67
1/1 to 1/12/50
19,808.98
$1,915,519.79
The Globe Company is a supplier of equipment to the meat packing and processing industries. It handled a line of meat molds constructed of aluminum and not competitive with the Hoy molds, which were of stainless steel *205 construction. It sales staff covered the meat industry in the United States. In 1949, C. E. Gambill, president of Globe, discussed with Hoy a proposal that Globe handle the Hoy molds on a jobbing basis. Hoy declined this. Gambill then discussed with Hoy the purchase of the business of the Company. In January 1950, Hoy and Gambill came to an agreement. A preliminary agreement was signed on January 3. This was followed by a formal contract, dated January 12, 1950, which provided: "THIS AGREEMENT OF PURCHASE AND SALE made this 12th day of January, 1950, by and between HOY EQUIPMENT CO., a Wisconsin corporation, located at Milwaukee, Wisconsin, party of the first part, hereinafter referred to as 'Hoy,' and THE GLOBE COMPANY, an Illinois corporation, located at Chicago, Illinois, party of the second party, hereinafter referred to as 'Globe'; "THE PARTIES AGREE: "(1) Hoy hereby agrees to sell to Globe and Globe hereby agrees to purchase from Hoy on the closing date for an aggregate purchase price of Two Hundred Twenty-Five Thousand Dollars ($225,000.00), to be increased or decreased but only to the extent as hereinafter provided, the following described personal property owned *206 by Hoy at the close of business on the closing date: "(a) All accounts receivable
owing to Hoy for merchan-
dise theretofore shipped to
Hoy's customers by Hoy and
unpaid on the closing date
$ 41,046.60
"(b) All Hoy's current sal-
able items of merchandise in-
ventory on hand and in transit
to Hoy, excepting all baked
loaf pans and covers, where-
ever located,
140,953.40
"(c) All tools belonging to
Hoy now in the physical pos-
session of its manufacturers,
The Vollrath Company, She-
boygan, Wisconsin, and Alloy
Products Co., Waukesha, Wis-
consin, complete (except for
such jigs, fixtures, and like
items owned by either of said
manufacturers and not there-
tofore charged to and paid for
by Hoy) for the manufacture
of the following designated
ham molds and loaf molds,
together with covers, now be-
ing sold or being currently
held out for sale by Hoy: "Ham Molds
Nos. 108, 109, 112,
114, 116, P. 16
"Loaf Molds
Nos. 5S, 55S, 66S
43,000.00
Total
$225,000.00
"The aforementioned purchase price of merchandise inventory has been computed on the basis of factory cost to Hoy, plus the lesser of (i) seven percent (7%) of such factory costs; *207 or (ii) Seven Thousand Dollars ($7,000.00). "If/ on the closing date the aggregate of the purchase prices of (a) such merchandise inventory, as so computed; and (b) accounts receivable, computed at Hoy's selling price to its customers; and (c) the aforementioned tools, which purchase price is hereby fixed in the amount of $43,000.00, exceed $225,000.00, the aforementioned aggregate purchase price of $225,000.00 shall be increased by the amount of such excess; and if such aggregate purchase price on the closing date, as so computed, is less than $225,000.00, such purchase price of $225,000.00 shall be decreased accordingly. "(2) Hoy agrees to sell to Globe and Globe agrees to buy from Hoy on the closing date all of Hoy's legal and equitable right, title, and interest in and to the following described Letters Patent of the United States, pending applications for Letters Patent of the United States, and Canadian Letters Patent and pending application for Canadian Letters Patent, now owned by Hoy, and the inventions and designs covered thereby, including any and all reissues of said Letters Patent, to be held and enjoyed by Globe to the full end of the term for which said *208 Letters Patent are granted, as fully and entirely as the same would have been held and enjoyed by Hoy had this sale and assignment not been made: "United States
Pending Applications
Letters Patent
for United States
Letters Patent
Nos. 2,310,956
2,310,957
Serial No. 560,983
2,310,958
706,888
2,431,253
8,901
"United States
Canadian Letters Patent
Design Letters
and Application for
Patent
Canadian Letters
Patent
Nos. 119,783
140,093
140,094
Patent No. 433,415
148,243
Application - Serial
154,683
No. 563,514 and as the purchase price of all of such Letters Patent, Globe agrees to pay Hoy for a period of ten years, the first payment to be made March 15, 1950, a royalty of ten percent (10%) on all sales made by Globe subsequent to January 31, 1950, of all ham molds and loaf molds, including covers and parts, embodying or made in accordance with any of the said inventions and/or designs, including all sales of converted molds. The royalty hereby reserved to Hoy shall be paid to it on the fifteenth day of each and every month during said ten-year period, said monthly payment to include all such royalties upon such merchandise sold *209 and shipped by Globe to its customers during the prior month. Each such monthly payment shall be accompanied by Globe's itemized statement of such sales made by it in the prior month, which monthly statement shall be subject to audit and verification directly from Globe's books and records by Hoy at any reasonable time; and any returns and allowances with respect to such sales, allowed by Globe, shall be taken by it as a reduction of sales upon which such royalty is payable for the month in which such returns or allowances are made and allowed by Globe. "If at any time it is the opinion of either party hereto that the amount of royalty payable hereunder by Globe to Hoy is restricting the volume of business, the parties will confer, and upon mutual agreement will make such changes as seem necessary. "Globe agrees to place upon any item manufactured and sold by it or for its account, embodying any of such inventions or designs, a distinct mark embracing the name 'Hoy,' including, but not limited to, a mark embracing a name such as 'Globe-Hoy'; and Hoy hereby grants to Globe the right to file application for and thereafter to use a trade-mark embracing such name on any such item *210 sold by Globe. "(3) The closing date hereunder shall be the close of business on January 31, 1950. "(4) The purchase price payable hereunder by Globe to Hoy for Hoy's accounts receivable, merchandise inventory, and tools shall be paid as follows: "(i) Upon the signing of this agreement by the parties hereto, Fifty Thousand Dollars ($50,000.00) thereof in cash shall be deposited by Globe with The Continental Illinois Bank and Trust Company, Chicago, Illinois, escrow agent hereunder, or with such other bank or trust company as the parties may agree upon, to be held by such escrow agent under this agreement until the closing date; and on such date, upon performance by Hoy of the agreements herein agreed to be performed by it, such escrow agent shall pay over said Fifty Thousand Dollars ($50,000.00) to Hoy; and "(ii) the balance of said purchase price shall be paid over in cash to Hoy by Globe on the closing date upon performance by Hoy of the agreements herein agreed to be performed by it. "(5) Excepting only invoices for merchandise inventory on hand and in transit on the closing date which Hoy hereby agrees to pay, Globe hereby agrees to assume, pay for, and perform all purchase *211 contracts entered into by Hoy prior to the closing date with respect to and vovering ham molds, loaf molds, covers, parts, presses, smoke sticks, spring lifters utility pressure covers, Dual Vacuum Suffer No. 427 molds and tools for such No. 427 mold. "(6) Any item of merchandise inventory sold to Globe by Hoy hereunder and not resold by Globe within one year from the closing date, and any item of merchandise inventory received by Globe under a Hoy purchase contract the performance of which was assumed by Globe under Paragraph (5) hereof and not resold by Globe within one year from the date such item was delivered to Globe, may be resold to Hoy by Globe, and Hoy agrees to purchase and pay for the same at Globe's purchase price hereunder; and Globe agrees to carry such item on a consignment basis for the account of Hoy and to sell the same in the ordinary course of business, and upon such sale to pay to Hoy Globe's purchase price hereunder. "All or any part of any account receivable purchased by Globe from Hoy hereunder and which remains uncollected by Globe within six months from the closing date may be assigned by Globe to Hoy, and Hoy agrees to repay Globe its purchase price *212 of such account receivable or part thereof. "(7) Hoy agrees that it will not directly or indirectly enter into, or engage in any way in, the ham mold and loaf mold business anywhere in the United States, except in the states of Nevada and New Mexico and in the County of Hardin of the state of Illinois, nor in the countries of Canada and Mexico, for a maximum period of ten (10) years from March 1, 1950 so long as Hoy receives royalties from Globe hereunder; provided, however, that if for any period of time within said ten-year period Globe fails to pay royalties to Hoy hereunder because Globe makes no sales of ham molds or loaf molds due to strike or fire at its plant or other cause beyond its control which prevents it from manufacturing and/or selling such ham molds and loaf molds in the ordinary course of business, Hoy will not engage in such business during such period of time. "(8) Globe agrees to exert its best efforts to promote the demand for and the sale of ham molds and loaf molds embodying the inventions and/or designs covered by the patents hereby sold by Hoy to Globe. Globe agrees to reimburse Hoy for any authorized travel or expense that it or Frank H. Hoy may be put *213 to in helping the maintenance and development of such sales of ham molds and loaf molds; and Hoy, for and in behalf of itself and Frank H. Hoy, agrees to assume and pay the cost of any such travel or expense, therefore unauthorized by Globe, incidental to the maintenance and development of such sales of ham molds and loaf molds. "(9) Hoy represents and warrants that on the closing date it will have full legal and equitable right, title, and interest in and to all of the properties herein agreed to be sold to Globe on such date; and that on such date no other person, firm, or corporation shall have any claim to or lien upon such right, title, or interest; and that on such date Hoy will be fully authorized to make such sale to Globe; and on or before the closing date, Hoy agrees to change its corporate name so as to eliminate therefrom the name "Hoy." "(10) This agreement integrates all prior agreements of the parties hereto with respect to the subject matter hereof, including the memorandum agreement between the parties hereto dated January 3, 1949; and on the closing date the parties hereto agree to make, execute, and deliver to each other such agreements and documents, including *214 written bills of sale and assignments, not inconsistent with the terms hereof, as may be necessary in order to carry out the terms of this agreement; and the parties agree to render such assistance to each other as may be reasonably necessary between the date of this agreement and the closing date in the verification of Hoy's merchandise inventory, tools, and accounts receivable; and for a reasonable period of time after the closing date, Hoy agrees to make its books and records available to Globe for such verification purposes. "(11) Hoy agrees to protect, defend, and save Globe harmless from any and all loss, cost, damage, or liability, including attorneys' fees, which Globe may suffer from any claims, demands, action or causes of action, which may be made or had against it, under the Bulk Sales Law of Wisconsin, by any creditor of Hoy on the closing date; it being understood that Hoy, at its request, may undertake the defense to such claim. "(12) This agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns." Hoy also wrote Globe as follows: "Because I am the principal stockholder of Hoy Equipment *215 Co., a Wisconsin corporation, located at Milwaukee, Wisconsin, and personally have been continuously active in and associated with said company since its date of incorporation, and am the assignor of numerous United States and Canadian Letters Patent owned by said corporation, and in consideration of your entering into an agreement on January 12th, 1950, to purchase certain merchandise inventory, accounts receivable, tools, and said Letters Patent belonging to Hoy Equipment Co., I agree: "(1) That I will not directly, or indirectly, either in person or as a stockholder in or employee or agent of any other person, corporation, partnership, or association, or as a member of any partnership or association, or otherwise, enter into, engage in, or become interested in the ham mold and loaf mold business anywhere in the United States, except in the states of Nevada and New Mexico and in the County of Hardin of the state of Illinois, nor in the countries of Canada and Mexico, for a maximum period of ten (10) years from March 1, 1950, so long as Hoy Equipment Co. receives royalties from The Globe Company as provided in the agreement of January 12th, 1950; provided, however, that if, for *216 any period of time within said ten-year period, The Globe Company fails to pay royalties to Hoy Equipment Co. because The Globe Company makes no sales of ham molds or loaf molds due to strike or fire at its plant, or other cause beyond its control, which prevents it from manufacturing and/or selling such ham molds and loaf molds in the ordinary course of business, I will not engage in such business during such period of time. "(2) That The Globe Company shall have the right to place upon any item manufactured and sold by it or for its account, embodying any of the inventions or design of the Letters Patent, sold by Hoy Equipment Co. to The Globe Company, a distinct mark embracing the name 'Hoy,' including, but not limited to, a mark embracing a name such as 'Globe-Hoy'; and I hereby agree that The Globe Company shall have the right to file application for registration of trade-marks consisting of, or including, the name 'Hoy' on any such item sold by The Globe Company; and I further agree to execute any and all documents that may be required in order that The Globe Company may register said trade-marks." In January 1950 Hoy recommended to Gambill that Globe employ De Cressy to *217 maintain and expand the sales of the Hoy molds. To induce De Cressy to accept such employment Hoy agreed to pay De Cressy 20 per cent of the royalties he was to receive so long as he worked for Globe. De Cressy accepted employment by Globe, but left that company in 1951. Hoy acquired from the other stockholders of the Company by January 17, 1950, all of the stock they had held. His basis in the entire stock was $116,350. Pursuant to the agreement the name of the Company was changed to H. E. Company, to eliminate the name "Hoy". On July 31, 1950, the Company was dissolved and liquidated, and Hoy received all the assets and assumed the liabilities. Among the assets was the contract with Globe. Other than the contract the assets and liabilities were as follows: Assets
Cash
$ 10,425.88
Notes and accounts receivable
27,985.04
Inventory
12,376.11
Investment account with Marine National Ex-
change Bank, Trust Department
179,279.20
Depreciable property
1,487.40
Total
$231,553.63
Liabilities
Accrued expenses - Payroll taxes
15.00
Commissions and Bonuses
2,181.50
Federal income tax
23,746.95
Wisconsin income tax
2,103.92
Reserve for Depreciation
371.85
Total
$ 28,419.22
Difference
$203,134.41
*218 In 1950 Globe paid to the Company royalties amounting to $27,512.25, 20 per cent of which was paid over to De Cressy. In 1950 Globe paid to Hoy $11,649.90 in royalties for the months of August through November 1950 of which Hoy paid over to De Cressy 20 per cent. Royalties for December were paid to Hoy in 1951. Globe paid Hoy as royalties in 1951, 1952 and 1953 the amounts of $29,685.41, $32,844.09 and $32,401.94, respectively. Hoy paid over to De Cressy $2,435.96 in 1951. The value of the contract with Globe on July 31, 1950, was not ascertainable. No part of the royalty or other consideration was paid for Hoy's individual agreement not to compete. Opinion Hoy liquidated a wholly owned corporation on July 31, 1950, taking over the assets and assuming the liabilities. In the petitioners' return for 1950 they reported as long term capital gains upon the liquidation the excess over basis of the net physical assets received plus the net royalties received during the year. For 1951, 1952 and 1953 they reported the net royalties received from Globe as additional long term capital gains. The respondent determined that the contract with Globe for future royalties had a value of *219 $123,638.85 on July 31, 1950, that the reported value of the assets received on liquidation should be increased accordingly and that the royalties received thereafter constituted ordinary income subject to deductions for amortization of the determined basis for the contract over its remaining term. The petitioners contend that the value of the Globe contract was not ascertainable on July 31, 1950, and that, pursuant to , the royalties received thereafter were additional capital gains from the liquidation. This rule has also been applied in , , (1954); affd. (C.A. 2, 1948); and (C.A. 9, 1949). The respondent arrived at a valuation through the application of Hoskold's Formula based upon the Hoy Equipment Company's sales from January 1, 1944 to January 12, 1950, computing royalties of 10 per cent thereon and finding the average royalty per day for this period, then multiplying by the number of days remaining in the term of the *220 contract and applying a factor based on a return rate of 15 per cent. It is argued that this formula is supported by the fact that at the end of 1953 Hoy had received $106,581.34 in royalties and by the end of 1956 had received $167,523.60. There were a number of factors tending to make uncertain any forecast of the sums to be realized from the contract. It was dependent upon future production and sales by a company over which Hoy had no control. It depended upon the extent Globe would utilize the patents, which were principal factors in Hoy's business, but only a part of Globe's interests. It was uncertain whether competition or new inventions would depress the sales volume or render the products obsolete. Globe used heavier gauge steel and increased the life of the molds which made replacements less frequent. Hoy believed that employment of De Cressy by Globe was important to maintain sales and was willing to pay him a part of the royalty to stay, but it was uncertain how long De Cressy would remain with Globe. In fact he left that employment in 1951. It could not be known whether the parties might agree to reduce the royalty as provided in the contract. Such a reduction did occur *221 in 1955. In view of these uncertainties the valuation proposed by the respondent is, in our opinion, too speculative to stand. We find that the fair market value of the contract was not ascertainable on July 31, 1950. The respondent contends further that at least some part of the royalties or other payment under the contract was paid for Hoy's agreement not to compete with Globe and that such part is taxable as ordinary income. The letter of agreement was given at the request of Globe and no consideration therefor was specified in the letter or in the contract. Hoy had no intention of competing and, the patents having been transferred to Globe, he was in no position to compete without infringing upon the patents and could not sell a competing mold. The agreement was a part of the whole transaction and we find that no part of the royalties or other consideration was paid for it. Decisions will be entered for the petitioners.